IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:20CR227 |
| vs. | |
| | FINDINGS AND RECOMMENDATION |
| ROBERT PECK JR., | |
| Defendant. | |

This matter is before the Court on Defendant's Motion to Suppress (Filing No. 26). An evidentiary hearing was held on November 3, 2021. Following the hearing, Defendant sought leave to file a post-hearing brief. (Filing No. 51.) This request was granted, and Defendant submitted a supplemental brief on December 30, 2021. (Filing No. 54.) The government submitted a responsive supplemental brief on January 27, 2022. (Filing No. 57.)

Briefing is now complete in this case and a transcript has been filed. Thus, the matter is now ripe for disposition. For the reasons explained below, the undersigned will recommend that the motion be denied.

## FACTS

On June 19, 2020, the Omaha Police Department ("OPD") received an anonymous tip about Defendant through Omaha Crime Stoppers.[1] (TR. 8-9; Ex. 1.) The individual provided the following information:

---

[1] Omaha Crime Stoppers allows citizens to make anonymous tips regarding drug activity to law enforcement. (TR. 7-8.) Individuals who provide tips to Crime Stoppers are assigned an ID number and can provide multiple tips under the same ID number. (TR. 8-9; Exs. 1, 2.)

> His name is bobby peck jr. He lives in ZAG apartments right behind three happiness off Leavenworth. He's a 4-time convicted felon with a loaded gun, cocaine, weed, steroids and more drugs. I've known him for years but it's starting to get scary. He has a safe inside his closet [that] has thousands in cash and drugs.

(Ex. 1.) The individual described Defendant as a white male with short brown hair, glasses, and tattoos on his arms and chest. (TR. 9-10; Ex. 1.) The individual stated Defendant was 6 foot 3, weighed 200 pounds, was thirty years old, unemployed, and referred to as "Bad new bobby." (TR. 9-10; Ex. 1.) The individual reported the types of drugs Defendant sold, where the drugs were stored, and that the drug activity took place in Defendant's apartment where Defendant also kept weapons. (TR. 9-10; Ex. 1.) Between June 19, 2020 and July 14, 2020, the individual made six Crime Stoppers reports regarding Defendant, during which time he reported Defendant had guns and was selling drugs from his apartment and was romantically involved with a minor who was living with him in the apartment. (TR. 9; Ex. 1.)

On July 13, 2020, OPD received another Crime Stoppers tip about Defendant. (Ex. 2.) This tip reported the following:

> He's been selling drugs for a long time, last night I watched him take a 16-year old back to his apartment to sell her drugs. Mu[l]tiple times he's tried to sell me guns coke weed and steroids in the hallways at home. His apartment is 2312 3rd floor. Robert peck needs to be taken down asap! He threaten to kill my wife once awhile back to. I need to stay anonymous but I fear for the safety of that girl I haven't seen her leave.

(Ex. 1.) The July 13th tip provided Defendant's name, nickname, gender, ethnicity, height, weight, and hair style. (Ex. 1.) The tip indicated Defendant wore glasses, had tattoos, had facial hair, was approximately thirty-years old, and was a four-time convicted felon. (Ex. 1.) The tip identified the types of drugs Defendant sold and stated Defendant had drugs in his apartment. (Ex. 1.) The tip reported that Defendant had loaded weapons, guns in a safe in a closet, and a fridge with cocaine. (Ex. 1.) This tip stated that activity involving drugs, firearms, Defendant's involvement with an underage girl was occurring at the time the tip was provided. (Ex. 1.)

Detective Paul Milone ("Detective Milone") testified at the evidentiary hearing in this matter. Detective Milone has worked for the OPD for just under twenty-three years. (TR. 6.) During that time, he has been assigned to the uniform patrol, gang unit, SWAT team, and narcotics unit. (TR. 6.) Detective Milone has been assigned to the narcotics unit for the last fourteen years

and has specialized training in narcotics investigations and undercover operations. (TR. 6-7.) Detective Milone testified he reviewed the tips described above and found them credible based on his training and experience. (TR. 11, 15.) Detective Milone testified he found the June 19th tip credible due to its specificity and that the tip was one of the most specific tips he had ever received. (TR. 11; Ex. 1.) He also testified he found the July 13th tip credible based on its specificity and because it was like the June 19th tip. (TR. 15.) Detective Milone testified he did not know whether the July 13th tip came from the same individual who provided the June 19th tip, but that the July 13th tip identified the tipster with a different ID number. (TR. 14; Exs. 1, 2.)

Detective Milone testified that after receiving the tips, he began investigating Defendant electronically by using the NCJIS database. (TR. 15.) He found a picture of Defendant on the database and learned Defendant's criminal history and that Defendant lived at the ZAG Apartments. (TR. 15-16.) He also realized he was aware of Defendant from a previous investigation that was conducted by someone else based on Defendant's nickname, "Bad News Bobby." (TR. 15-16.) Detective Milone testified he spoke to other officers who reminded him why Defendant's name was familiar. (TR. 46.) Detective Milone testified that following the database check, he decided to take the investigation further by continuing the investigation at the ZAG Apartments. (TR. 16.)

On July 16, 2020, Detective Milone went to the ZAG Apartments with Detective Edith Anderson ("Detective Anderson") and Officer Jeffrey Vaughn ("Officer Vaughn"). (TR. 17-18.) Detective Anderson has been with the OPD for twenty-one years and has been assigned to uniform patrol, gang unit, and has been a narcotics detective for the last fourteen years. (TR. 67-68.) Detective Anderson testified she has specialized training in narcotics and drug-trafficking investigations. (TR. 68-69.) Officer Vaughn has been employed in law enforcement for twenty-three years. (TR. 82.) Officer Vaughn has been a certified K-9 handler with the OPD for the last fifteen years and assists the narcotics unit with its investigations. (TR. 82; Ex. 3.)

Detective Andersen testified that once at the ZAG Apartments, she contacted the property management and explained that officers were investigating a drug complaint regarding a resident at the complex. (TR. 70-71.) ZAG management confirmed Defendant lived at the complex in apartment number 2312. (TR. 71; Ex. 4.) The property management gave officers access to Defendant's apartment building. (TR. 17.) Property management walked the officers, as well as

3

Officer Vaughn's certified narcotics-detecting K-9, Nacho, to the building where Defendant lived and gave them access. (TR. 17; TR 71.) The exterior doors to the building were locked, but management opened the door to the building using an electronic key and told the officers that Defendant's apartment was on the third floor. (TR. 16-18, 72, 94.) Detective Milone, Detective Anderson, and Officer Vaughn testified they believed the apartment staff voluntarily provided them access to the hallway of Defendant's apartment building so they could conduct a drug investigation. (TR. 17-20, 72, 86-87.)

The officers testified that the hallway of the apartment building was communal and the apartment residents did not have dedicated personal space in the hallway. (TR. 19, 73, 86.) Detective Milone testified the hallway had approximately eight to ten apartment doors. (TR. 19; Ex. 4.) When the officers got to the third-floor hallway, Officer Vaughn conducted a dog sniff with Nacho. (TR. 20, 87.) Officer Vaughn testified that he kept Nacho on his leash and gave him a command to sniff for the odor of drugs. (TR. 87.) Officer Vaughn testified Nacho sniffed along the bottom of apartment door seams and then alerted and indicated to the odor of drugs coming from apartment number 2312. (TR. 87.) Officer Vaughn stated that performing dog sniffs around door seams is a typical practice when deploying dogs in this context. (TR. 87.) Following Nacho's positive indication, officers walked toward the elevator to leave the building. (TR. 26.) As the officers were approaching the elevator, they observed Defendant exit the elevator into the hallway, walk past the officers, and enter apartment number 2312. (TR. 26-27; Ex. 4.)

The officers each testified, based on their training and experience, they believed they had reasonable suspicion to conduct a dog sniff in the hallway of the ZAG Apartments from the information gathered during the investigation. (TR. 19-20, 73, 95.) Detective Milone testified he could not recall participating in an investigation where officers utilized a dog sniff to the exterior of a single-family, detached dwelling for the purposes of obtaining a warrant, but he had participated in dozens of investigations where officers used a dog sniff of an apartment door to obtain a warrant. (TR. 19-20, 43-44.) Detective Andersen testified that dog sniffs of hallways in apartment buildings happen routinely. (TR. 73-74.) Officer Vaughn testified that he has participated in a dozen to a couple dozen of investigations where property management gave him access to communal space to conduct a dog sniff. (TR. 87.)

Detective Milone testified he has received training regarding the Fourth Amendment, although he could not specify the amount he has received and exactly when it occurred. (TR. 40.) Detective Milone further testified that he believes he has a duty to be aware of statutes and case law that apply to law enforcement officers and that it is important to follow the law. (TR. 42.) He testified that he does not research the law, but usually waits for that information to get passed down to him from the department. (TR. 42.) Detective Anderson also testified she has received training related to the Fourth Amendment and that officers discuss and keep up on laws that are changing. (TR. 77-80.) Detective Anderson testified she has never had to get a search warrant to search a public area when she had reasonable suspicion. (TR. 80.) Officer Vaughn testified he believes it is part of his job to be aware of statutes and case law regarding activities he undertakes. (TR. 89.) Detective Milone, Detective Anderson, and Officer Vaughn all testified they were not specifically aware of cases named *Florida v. Jardines* or *State v. Ortiz*. (TR. 43-44, 58, 78-80, 89-90.)

On July 17, 2020, Detective Milone applied for a warrant to search Defendant's apartment. (Exs. 4, 5.) The affidavit in support of the search warrant stated that Detective Milone had received a Crime Stoppers complaint in July, 2020 that Defendant, also known as "Bad News Bobby," was selling drugs out of his apartment. (Ex. 4.) The affidavit indicated the Crime Stoppers tip stated Defendant was selling marijuana, cocaine, heroin, hash oil and steroids and that Defendant was in possession of firearms. (Ex. 4.) The affidavit also stated the tip described Defendant as a convicted felon who was approximately thirty years old, 6 foot 2, one-hundred-eighty pounds, with short hair and multiple tattoos. (Ex. 4.) Detective Milone's affidavit explained how he researched the NCJIS database and learned that Defendant is thirty-years old, 6 foot 2, one-hundred-eighty pounds, has multiple tattoos, a convicted felon, and has been convicted of possessing firearms illegally. (Ex. 4.)

The affidavit then explained that ZAG Apartment management confirmed Defendant lived on the third floor of the complex in apartment number 2312 and that management gave officers access to the apartment building where Defendant resided for investigative purposes. (Ex. 4.) The affidavit stated that once officers got to the 3rd of the apartment building, Nacho walked up and down the hallway, sniffing eight to ten of the doors on the 3rd floor and that Nacho gave a positive indication of narcotics under the door to apartment 2312. (Ex. 4.) The affidavit further stated that Officer Milone was standing next to Officer Vaughn when Nacho gave the positive indication for narcotics inside apartment 2312. (Ex. 4.) The affidavit also stated that while they were waiting for

5

the elevator to leave the apartment complex, officers observed a white male who matched the exact description of Defendant walk into apartment 2312 and that Detective Milone and Officer Vaughn compared a photograph from the NCJIS database to the male they observed and confirmed the person was Defendant. (Ex. 4.) Detective Milone testified that based on his training and experience, he included enough facts in his affidavit to establish probable cause.[2] (TR. 27.)

Based on the information in the affidavit, a search warrant was issued on July 17, 2020, and the warrant was executed on July 21, 2020. (TR. 27-29, 31-32.) Detective Milone testified that during the search, officers located marijuana, marijuana derivatives, anabolic steroids, multiple firearms, drug paraphernalia, a safe, and things consistent with narcotics distribution. (TR. 31-32.) Detective Milone testified that the information provided in the Crime Stoppers tips was consistent with what officers observed during the search as to the placement of weapons, number of weapons, and the safe including money and drugs. (TR. 32.)

## DISCUSSION

Defendant requests that the Court suppress all evidence obtained from the search of his apartment on July 21, 2020. Defendant argues the warrantless dog sniff of his apartment door constituted an illegal search. Defendant further contends the information in the application and affidavit for the search warrant was insufficient to establish probable cause. Finally, Defendant argues the good faith exception to the exclusionary rule is inapplicable.

### 1.    Dog Sniff

Defendant argues the evidence should be suppressed because the use of a drug detection dog to sniff his apartment door violated the Fourth Amendment. Defendant does not dispute that the officers were lawfully in the apartment building, nor does he dispute that the officers and K-9 never physically entered his apartment. Defendant also does not challenge the reliability of the K-9 that performed the sniff. Rather, Defendant contends that the sniff was unlawful because the area *under* the apartment door and *inside* his apartment are protected areas under the Fourth Amendment. The undersigned finds this argument unpersuasive.

---

[2] Detective Milone testified that Defendant only had one felony conviction and was not a four-time felon as stated by the tipster. (TR. 54.) Detective Milone testified he did not include information about the tipster's inaccuracy regarding this matter in the affidavit because he did not think it was important. (TR. 53-54.) Detective Milone also acknowledged that he did not include the Crime Stoppers tip from June in the affidavit. (TR. 46.)

Detective Milone's affidavit offered in support of the search warrant provided that Nacho walked up and down the hallway, sniffing eight to ten doors on the 3rd floor and that Nacho gave a positive indication of narcotics *under* the door to apartment 2312. The affidavit further stated that Officer Milone was standing next to Officer Vaughn when Nacho gave the positive indication for narcotics *inside* apartment 2312. However, Officer Vaughn, who is the certified K-9 handler that handled Nacho during the search, testified that Nacho sniffed along the *bottom of apartment door seams* and then alerted and indicated to the odor of drugs coming *from* Defendant's apartment. Officer Vaughn further testified this is normal practice for dog sniffs in this context. This type of search, as described by Officer Vaughn, is permissible under Eighth Circuit law.

The Eighth Circuit has found that "there exists no generalized expectation of privacy in the common areas of an apartment building," *United States v. Brooks,* 645 F.3d 971, 976 (8th Cir. 2011), and that dog sniffs outside apartment doors do not constitute a search under the Fourth Amendment. In *United States v. Scott*, 610 F.3d 1009 (8th Cir. 2010), the Eighth Circuit found a drug dog's sniff of an apartment door frame from a common hallway did not constitute a search subject to the Fourth Amendment. The Eighth Circuit reasoned that conduct that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment and that any interest in possessing contraband cannot be deemed legitimate. The court stated that conduct that only reveals the possession of contraband does not compromise a legitimate privacy interest. Similarly, in *United States v. Roby*, 122 F.3d 1120, 1124 (8th Cir. 1997), the Eighth Circuit held that a warrantless dog sniff performed in the corridor outside the defendant's hotel room did not violate the Fourth Amendment. The court found that although the defendant had an expectation of privacy in his hotel room, his expectation of privacy did not extend beyond the room because the corridor outside the room was traversed by many people.

Defendant contends, however, that Eighth Circuit cases decided after the Supreme Court's decision in *Florida v. Jardines, 569 U.S. 1 (2013)* indicate that warrantless use of dog sniffs in hallways of apartment complexes could constitute illegal searches. In *Jardines*, officers used a drug detection dog to check for narcotics while standing on the front porch of the defendant's residence. The dog alerted to the presence of narcotics coming from the residence and this information was used to obtain a search warrant for the residence. The Supreme Court held that the dog sniff was a search under the Fourth Amendment because it occurred within the curtilage

7

of the residence. The Court stated that the front porch was a "classic exemplar" of curtilage, the area "immediately surrounding and associated with the home." *Id*. at 6. The Court found that although the officers had an implicit license to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave," they had no invitation to "introduc[e] a trained police dog to explore the area around the home in hopes of discovering incriminating evidence." *Id*. at 8-9.

*Jardines* is distinguishable from the case at hand for several reasons. First, the *Jardines* case involved a dog sniff conducted on a front porch of a residence which was found to be curtilage, whereas the dog sniff in this case occurred in a communal hallway of an apartment building. Second, unlike *Jardines*, officers in the situation at hand did not merely have an implicit license to approach the home. Rather, officers were lawfully in the apartment building because property management granted them access to conduct their investigation. See *United States v. Penaloza-Romero*, Crim. No. 13-36, 2013 WL 5472283, at *8 (D. Minn. Sept. 30, 2013) (distinguishing *Jardines* and finding that dog sniff of an apartment hallway was lawful because the building manager let law enforcement into the building). Defendant himself acknowledges that the Eighth Circuit has not yet addressed how *Jardines* applies to residents of apartments and interior hallways of an apartment complex. Defendant has not presented any persuasive reason why the undersigned should interpret *Jardines* as applying to common hallways in an apartment complex in situations such as those presented here. Therefore, the undersigned finds the dog sniff did not violate Defendant's Fourth Amendment rights.

### 2.    Sufficiency of Warrant

To be constitutionally valid, "a search warrant must be supported by a showing of probable cause." *United States v. Summage*, 481 F.3d 1075, 1077 (8th Cir. 2007). Probable cause exists if, based on the totality of the circumstances, a showing can be made "sufficient to create a fair probability that evidence of a crime will be found in the place to be searched." *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002) (internal quotation omitted). "Probable cause to issue a search warrant exists when an affidavit in support of the warrant sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." *United States. v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (quotation omitted). However, "[w]hen faced with a warrant containing information

obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause." *United States v. Finley,* 155 F. Supp. 3d 962, 970 (D. Neb. 2015).

Defendant argues that without the information pertaining to the K-9 alert from the apartment, the warrant would not be supported by probable cause. For the reasons explained above, the undersigned has concluded that the dog sniff was lawful. However, even assuming this information was not legally obtained and must be excised from the affidavit, probable cause would still exist because the Crime Stopper's tip was specific and corroborated by officers.

It is well-established that an informant's tip may be sufficient to support probable cause if the totality of the circumstances indicate that it is reliable. *United States v. Sidney,* No. 4:09CR3072, 2009 WL 10681046, at *2 (D. Neb. Aug. 6, 2009). "An anonymous tip from an informer may serve as a basis for probable cause as long as its reliability is established through corroboration." *United States v. Briley,* 726 F.2d 1301, 1306 (8th Cir. 1984). *See also United States v. Thompson,* No. 4:15CR3122, 2016 WL 1212571, at *3 (D. Neb. Feb. 19, 2016) ("When an informant's information is at least partly corroborated, . . . attacks upon credibility and reliability are not crucial to the finding of probable cause.").

Here, the information from the Crime Stoppers tip was very specific as to Defendant's personal information, physical description, and alleged drug activities. The tip provided Defendant's name, nickname, address, gender, ethnicity, height, weight, and hair style. The tip indicated Defendant wore glasses, had tattoos, had facial hair, was approximately thirty years old, and was a convicted felon. The tip identified the types of drugs Defendant sold and stated Defendant had drugs in his apartment. The tip also reported Defendant had loaded weapons, guns in a safe in a closet, and guns in the fridge with the cocaine. The specificity of this information suggested the tipster had first-hand knowledge of Defendant and his activities. Detective Milone testified that, based on his training and experience, he found this tip to be very credible due to its specificity.[3]

---

[3] Even though the tipster was incorrect about the exact number of felonies Defendant had on his record, this minor discrepancy is inconsequential given all the other accurate information provided by the tipster. *See United States v. Amaya,* 52 F.3d 172, 175 (8th Cir. 1995) (holding that slight discrepancies in information provided by informants were inconsequential in light of the totality of the circumstances).

9

The tip prompted Detective Milone to investigate, and his independent investigation corroborated the tip. Detective Milone testified that after reviewing the tip, he found a picture of Defendant on the NCJIS database and learned Defendant's criminal history and that Defendant lived at the ZAG Apartments. He also realized he was aware of Defendant from a previous investigation that was conducted by someone else based on Defendant's nickname, "Bad News Bobby." Detective Milone testified he spoke to other officers who reminded him why Defendant's name was familiar. The affidavit offered in support of the warrant explained how Detective Milone researched the NCJIS database and found Defendant. Detective Milone described Defendant in the affidavit as thirty-years old, 6 foot 2, one-hundred-eighty pounds, with multiple tattoos, and a convicted felon who has been convicted of possessing firearms illegally. The affidavit also stated officers personally observed Defendant walk into apartment 2312 and verified his appearance using the photo from the NCJIS database. Due to the tipster's reliability, as shown from the tip's specificity and the corroboration of the information by the officers, the information from the tipster supplied probable cause for issuance of the warrant.

### 3. Good Faith Exception

Defendant maintains the good faith exception to the warrant requirement is not applicable in this case because the officers were not sufficiently trained on search and seizure law. The undersigned has already concluded the warrant was supported by probable cause. However, even assuming it was not, the good faith exception would operate to preclude suppression of the evidence.

"Under the good-faith exception, evidence seized pursuant to a search warrant issued by a magistrate that is later determined to be invalid, will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). A "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the issuing judge's authorization." *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006) (quotation omitted). An officer's reliance on a warrant may be said to be unreasonable in four circumstances: (1) when the affidavit supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for the truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when it is entirely

unreasonable to believe that an affidavit provides probable cause to issue a warrant; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid. *Proell*, 485 F.3d at 431 (quotation omitted). "[When assessing the officer's good faith reliance on a search warrant under the *Leon* good faith exception, [courts] can look outside of the four corners of the affidavit and consider the totality of the circumstances, including what the officer knew but did not include in the affidavit." *United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014).

Defendant argues the good faith exception is inapplicable because the officers had not been sufficiently trained on what the Fourth Amendment requires for dog sniff searches. Defendant claims the officers' lack of familiarity with *Jardines* and *State v. Ortiz*, 257 Neb. 784, 600 N.W.2d 805 (1999) indicates the officers were not appropriately trained. However, the officers are not required to know case names to qualify for the good faith exception. Rather, the question is whether a reasonably well-trained officer would have known that the search was illegal. Considering the totality of the circumstances, the undersigned finds it was not unreasonable for the officers to believe the affidavit supplied probable cause for the warrant.

The officers, who have extensive experience in law enforcement, each testified, based on their training and experience, they believed they had reasonable suspicion to conduct a dog sniff. Detective Milone testified he has participated in dozens of investigations where officers used a dog sniff of an apartment door to obtain a warrant. Detective Andersen testified that dog sniffs of hallways in apartment buildings happen routinely. Officer Vaughn testified that he has participated in a dozen to a couple dozen of investigations where property management gave him access to communal space to conduct a dog sniff. Detective Milone testified that based on his training and experience, he believed he provided sufficient information in the affidavit to support probable cause. There is no evidence that the affidavit contained a knowing or intentional false statement or that the issuing judge wholly abandoned his judicial role in issuing the warrant. Based on the officers' previous experience with these types of searches, it was not entirely unreasonable for them to believe the warrant was supported by probable cause, nor was the warrant so facially deficient that the officers could not presume the warrant to be valid.

Further, as Defendant acknowledged in his brief, there is no post-*Jardines* case law from the Eighth Circuit that specifically states that dog sniffs of common hallways in apartments are

impermissible. Defendant himself acknowledged that the Eighth Circuit has not yet addressed how *Jardines* applies to residents of apartments and interior hallways of an apartment complex. "Officers should not be faulted for adhering to existing precedent until that precedent is authoritatively overruled." *United States v. Barraza-Maldonado*, 732 F.3d 865, 869 (8th Cir. 2013). *Scott* has yet to be "authoritatively overruled." Moreover, *Ortiz* is a Nebraska Supreme Court case and not binding precedent for this Court. Therefore, the undersigned finds the good faith exception to the warrant requirement applicable and that the evidence should not be suppressed.

Accordingly,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Robert Rossiter, Jr. that Defendant's Motion to Suppress (Filing No. 26) be denied.

Dated this 22nd day of February, 2022.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.